**LOUISVILLE WATER COMPANY, Inc., Appellant,**

v.

**Allan F. BOSLER et al., Appellee.**

Court of Appeals of Kentucky.

Oct. 11, 1968.

As Corrected Nov. 6, 1968.

Louis N. Garlove, Carl J. Bensinger, Morris, Garlove, Waterman & Johnson, Louisville, for appellant.

William Mellor, Louisville, for appellees.

PALMORE, Judge.

Louisville Water Company, Inc., appeals from a judgment entered on a verdict awarding Allan F. and Georgia C. Bosler, d/b/a George Bosler Leather Company, $7,834.69 for damage done to a stock of merchandise by water from a break in one of the water company's mains at the intersection of Market and Second Streets in Louisville on December 19, 1963.

The question is whether there was sufficient proof that the break resulted from the water company's negligence to warrant submission to the jury. We have concluded that there was.

All of the evidence upon which it would be necessary to predicate liability was obtained from Byron E. Payne, the water company's chief engineer and superintendent, first by interrogatories and then

through oral testimony. The salient information provided in response to the interrogatories was as follows:

The break was circumferential in an 8″ cast iron pipe 15 feet east of the west curb line of Second Street, seven feet north of the south curb line of Market Street.[1] The main was three feet deep. The surrounding soil was sand, gravel and clay. Cause of the break is unknown. Possible causes were "cold weather stresses and bending stresses due to settlement." The main was repaired by replacing a section of pipe and installing a sleeve. The water from the break ran through a "dead sewer line" beneath the south sidewalk of Market Street until it reached a Louisville Gas & Electric Company manhole through which it rose to the street level and flowed into the basement of the Boslers' store. This particular 8″ main runs from a 6″ main in Second Street westwardly to Sixth Street. It was installed in 1935. The water company had not taken any special precautionary steps to prevent breaks in the immediate vicinity, because it would be difficult "to explore or replace the soil or other structures such as sewers, gas pipes, etc." Other breaks in the intersection of Market and Second Streets during the year preceding December 19, 1963, were as follows:

| Date | Size of pipe |
|------|--------------|
| 1–24–63 | 6″ |
| 1–26–63 | 12″ |
| 2–2–63 | 12″ |
| 2–3–63 | 12″ |
| 2–4–63 | 6″ |
| 2–9–63 | 12″ |
| 8–3–63 | 6″ |

The evidence adduced through Mr. Payne's oral testimony was as follows:

On direct examination: Other utilities located beneath the surface of this intersection are gas mains, telephone conduits, electric conduits, and sewers. "The sewer in Second Street is in notoriously bad condition." It is a very old sewer made of stone blocks covered with stone slabs. It is still in use. The earth is composed of sand, gravel and some clay and is generally called sandy loam. It is typical of the soil in downtown Louisville, which is situated over an old river bed structure. "It would be quite an extensive foundation, to have to construct a foundation under any of our pipe, because it would mean piling a considerable depth, because the sewers are very deep and you would have to support from below the sewers." The main in question was made of cast iron, which "is used by practically everybody in the business." It is not customary to "dig up and look at pipes here and there to see if they are all right." The low weather temperatures during the week prior to and including December 19, 1963 were: December 13, 25°; December 14, 9°; December 15, 6°; December 16, 5°; December 17, 8°; December 18, 5°; and December 19, –1°. With respect to the condition of the sewers, "the soil beneath the streets in downtown Louisville, being mostly sand or sandy loam, is a fairly good support as long as it is contained. When there is an opening anywhere, say in a sewer, the sand tends to run into the sewer, and that will take the support from underneath the structure." It is difficult to discover such a condition "without digging up the whole length of the street."

On cross-examination: The weather conditions (temperatures) at and prior to the time of the break were not unusual. Under normal conditions the type of water pipes in use should last 100 years. The only occasions on which it is customary for the water company to dig up its pipes are when leaks occur or new connections are being made. Numerous leaks and breaks in one spot "would have some indication of the conditions." With respect to each of the seven breaks that had occurred in the intersection of Market and Second Streets during 1963 the mains had been uncovered

---

[1]. The Boslers' store building was located at 208 West Market street, four doors west of Second on the south side of Market.

so that they could be repaired. In "a couple" of these instances "there were certain repairs made in the sewers." We continue with direct quotation from the testimony:

Q— "Every time you had one of those breaks it caused a lot of wash and a lot of shifting of soil under Second and Market Streets, didn't it?"

A— "It could."

MR. GARLOVE: "He is asking if it did."

A— "I don't know."

Q— "It is reasonable to suppose that it would; isn't that right?"

A— "Most occasions, most of the wash went into the sewer."

Q— "But, I said, it is reasonable to suppose that when you have a break in a water main it causes some shifting of the soil in that vicinity; isn't that right?"

A— "It might."

Q— "And when you have seven breaks in one section in one year you know that you have a situation that is in need of something being done about it, don't you?"

A— "Most of these breaks you are referring to occurred in Second Street, or other than this particular main."

Q— "But they were in Second Street in the intersection?"

A— "Yes, sir; and closer to the sewer."

Q— "I take it that with these breaks you had some reason to believe that you had a great deal of shift in the soil underneath Second and Market Streets, did you not?"

A— "Well, we did have the Sewer Department—called their attention to the sewer, and they did fix the sewer."

Q— "When did they do that?"

A— "Well, they did that at the occasion of some of these other breaks here. I am not sure just which one, but I know they worked over there."

Q— "And you kept on having the breaks in that intersection, without considering this to be a time to dig up and see if the mains in that intersection were okay; is that right?"

A— "We didn't dig them up for that purpose. If we had dug them up we probably wouldn't have found anything."

Q— "How do you know that?"

A— "Well, I didn't dig them up; so I can't say I know, but we have dug others up that indicates that the ground under them was perfectly firm."

Q— "But you didn't dig them up there at Second and Market?"

A— "No."

Q— "Well, when you have a wash under the street caused by a broken main it can very easily wash the soil from underneath a section of pipe and leave that pipe over a void; isn't that right?"

A— "It would generally show up in the hole we have excavated whether it was washed beyond that particular excavation."

Q— "It can do that?"

A— "Yes."

Q— "And seven times in that one year before this break there was a possibility of that happening all

up and down in that section; isn't that right?"

A— "Yes, it is possible."

In Felsway Shoe Corp. v. Louisville Water Co., 311 Ky. 259, 223 S.W.2d 875 (1949), the water company was sued for damages to merchandise in the basement of the plaintiff's store in the 400 block of South Fourth Street in Louisville by water from a broken 12″ main which had been laid in 1934. The break occurred in 1946. There had been a lengthwise splitting in an 18-foot section of the pipe. The water company's superintendent of distribution testified "that a break in a sewer under Fourth Street near the 400 block during the 1937 flood caused the earth to go down under the water main, thereby causing a strain on the main, including the section which split in 1946. It was shown also that a strain could cause a water main to break." In reversing a judgment entered on a directed verdict for the water company this court said:

"Unquestionably the Water Company knew that as a result of the 1937 flood the water main in question was in such a condition that a break might be expected. No steps were taken to jack up the main, or to relieve it from strain. As a matter of fact, Felsway sought to show that at least eight other breaks and leaks had occurred in the water main within the 400 block following the 1937 flood and prior to the time of the break in question. * * * Felsway showed through Mr. Schuler that the Water Company knew its water main in the 400 block on Fourth Street had sagged as a result of the flood in 1937, and that such sagging would cause a strain on the main which might reasonably be expected to cause a break. [He said] also that a main such as the one in question could be expected to last 100 years or more. Under the circumstances, Felsway had a right to show that at least eight other breaks and leaks had occurred in the water main in the 400 block on Fourth Street after the 1937 flood. * * * As indicated at the outset, we do not think this case requires a consideration of the applicability of the res ipsa loquitur doctrine. That doctrine was applied in the case of Seale v. Coca-Cola Bottling Works of Lexington, Ky., 297 Ky. 450, 179 S.W.2d 598. However, we think the reasoning in that opinion is applicable to the case at bar. We point out therein that there are times when the law must be content with reasonable probabilities, and, therefore, must not exact the requirement that evidence in support of a cause of action be of such character as to preclude the possibility of a finding to the contrary. We think Felsway met the burden placed on it and introduced evidence sufficient to warrant the necessity of the Water Company going forward with its proof."

In Stein v. Louisville Water Co., Ky., 249 S.W.2d 750 (1952), suits were brought for damages from two breaks in the same water main as in *Felsway* but in the next block of Fourth Street, one of which occurred on April 17, 1949, and the other on March 24, 1950. In the words of this court's opinion reversing (on the ground of erroneous instructions) judgments favorable to the Water Company, "These breaks also were lateral splits. The evidence also attributed the cause to subsidence of the ground due to the extraordinary flood in January, 1937, which inundated the street several feet deep. The plaintiffs proved that as a result there was a general sinking of the sandy soil beneath downtown Fourth Street, and two large holes had opened up in this very intersection. There had been eleven breaks or leaks in this main within two blocks," etc. This court again rejected the water company's contention that the evidence did not justify submission of the case to the jury:

"Where it appears that the condition that resulted in the damage has either been in fact brought to the prior notice of the water company, which is actual notice, or the condition existed for such space of time as would afford the company sufficient opportunity to know of the defect, which is constructive notice, it is deemed sufficient evidence of negligence. McQuillin, Sec.

53.103. The defendant's superintendent and chief engineer testified a water main properly laid and normally used will last a hundred years. The plaintiff was not to be held to the burden of proving a defect in the particular section of pipe which burst. The defect was in one continuous line in close proximity to the plaintiffs' property. It is a logical inference that the defendant knew the main had become weakened by shifting or undermining of the soil upon which it rested during the twelve previous years. There was continuity of conditions. We think the evidence sufficiently established a prima facie case as it did in Felsway Shoe Corp. v. Louisville Water Company, supra."

In both the *Felsway* and *Stein* cases a known condition that *could* cause breaks was held sufficient to justify an inference that the condition *did* cause the breaks. In this case we have a known condition (the "notoriously bad condition" of the Second Street sewer) that could cause breaks in the mains, plus the actual occurrence of several breaks in this particular intersection, from which we think it can be equally inferred, as in *Felsway* and *Stein,* that the condition did cause the breaks. There are, of course, factual differences. We are aware, for example, that the defective condition of the Second Street sewer line may not have been as easily remediable as the washed out condition of the Fourth Street subsurface. The water company has no control over the Louisville and Jefferson County Metropolitan Sewer District and could not be expected to repair or replace the old sewer. But that is one of the problems with which the water company must be expected to cope as an incident of its business. Certainly it is in a better position to do so than are the helpless property owners along the street.

Another distinction between this and *Felsway* and *Stein* is that the Fourth Street breaks all occurred in one and the same main, whereas the previous breaks in the intersection of Market and Second Streets during 1963 were in the 12″ and 6″

pipes. It is our opinion, however, that if this circumstance calls for a different conclusion it was up to the water company to explain why, and for the jury to consider. As it is, and within the framework of the rationale in *Felsway* and *Stein,* the intersection of Market and Second Streets is small enough an area to justify an inference that a condition affecting one pipe is likely to affect another in the same manner.

 From what we have said with respect to the relevance and probative force of the evidence of previous breaks in the immediate area, it follows that the trial court did not err in admitting that evidence.

The judgment is affirmed.

All concur.